THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**Rose Marie M. Testa, as Executrix of the**
**Estate of Mary DeMarco, deceased,**

        **Plaintiff,**                    **CIVIL ACTION NO: 2:21-cv-05148-KSM**

**v.**

**Broomall Operating Company LP d/b/a**
**Broomall Rehabilitation and Nursing**
**Center; Broomall Operating GP LLC;**
**SavaSeniorCare, LLC; Terpax, Inc;**
**Vincent Rupert; Elizabeth Marasco-**
**Kennedy; and the Director of Nursing**
**during the events in question,**

        **Defendants.**

**<u>RESPONSE TO PLAINTIFF'S MOTION TO REMAND</u>**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................... 1

ARGUMENT ........................................................................................................................... 4

    **I.**   **Diversity jurisdiction exists because the non-diverse Defendants were added without required leave and were fraudulently joined to the action.** ......................................... 4

    **II.**  **Federal question jurisdiction exists as Plaintiff's Amended Complaint states a "willful misconduct" claim that is completely preempted by the PREP Act.** ................................ 4

    **III.** **Federal question jurisdiction exists because the PREP Act completely preempts all claims within the scope of PREP Act immunity.** ...................................................................... 7

      **i.**   **Plaintiff's claims fall within the scope of PREP Act immunity as they all "relate to" the administration or use of covered countermeasures by a "covered person."** ........................ 7

      **ii.**  **Recent administrative guidance reinforces the intended breadth of the immunity, and that the PREP Act is a statute of complete preemption.** ............................................................ 9

      **iii.** **Plaintiff's allegations fall within the scope of claims that are completely preempted by the PREP Act.** ...................................................................................................................... 11

    **IV.** **Federal officer jurisdiction exists as Defendants Rupert and Marasco-Kennedy were subject to the requisite federal officer control to satisfy the jurisdictional test.** .................. 14

      **i. The Individual Defendants are "persons."** ......................................................... 15

      **ii.The federal government exercised direct and detailed control over  Defendants' actions.** 15

      **iii. The allegations in the Amended Complaint arose from actions taken by Defendants pursuant to federal direction.** ............................................................................................. 22

      **iv. Defendants have appropriately asserted a "colorable defense."** ......................... 23

    **CONCLUSION** .................................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Bert Co. v. Turk*, 257 A.3d 93 (Pa. Super. 2021) ............................................................ 6

*Cessna v. Rea Energy Coop., Inc.,* 753 Fed. Appx. 124 (3d Cir. 2018) ......................... 15

*Fung v. Abex Corp.*, 816 F. Supp. 569 (N. D. Cal. 1992) ............................................... 22

*Garcia v. Welltower OpCo Grp. LLC*, 522 F. Supp. 3d 734 (C.D. Cal. 2021).......................... 7, 9

*Goepel v. Nat'l Postal Mail Handlers Union*, 36 F.3d 306 (3d Cir. 1994) ................................ 10

*In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*,
   790 F.3d 457 (3d Cir. 2015).......................................................................... 14

*Jefferson Cty. v. Acker*, 527 U.S. 423 (1999) .............................................................. 23

*Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393 (3d. Cir. Oct. 21, 2021) .................. 1, 6, 12

*Rachal v. Natchitoches Nursing & Rehabilitation Ctr. LLC*, Case 1:21-cv-334 (W.D. La. April
   30, 2021).............................................................................................. 7

*Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007) ............................................ 2, 5

*Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012)............................................... 15, 20

*Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007)............................................. 15

*Willingham v. Morgan,* 395 U.S. 402 (1969) ............................................................. 23

*Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387 (5th Cir. 1998)....................... 15

**Statutes**

1 U.S.C. § 1 ............................................................................................... 15

28 U.S.C. § 1367 ........................................................................................... 4

28 U.S.C. § 1442(a)(1)................................................................................... 3, 14

28 U.S.C. § 1447(e) ....................................................................................... 2

42 U.S.C § 1396r ......................................................................................... 16

42 U.S.C. § 1395i-3 ...................................................................................... 16

42 U.S.C. § 247d-6d(a) .................................................................................. 7

42 U.S.C. § 247d-6d(c)(1)(A)........................................................................... 5

42 U.S.C. § 247d-6d(d)-(e) ............................................................................ 10

42 U.S.C. §§ 247d-6d ............................................................................... 1, 5, 8

**Regulations**

42 C.F.R § 483............................................................................................ 16

42 C.F.R. § 483.10....................................................................................... 20

81 Fed. Reg. 68688...................................................................................... 17

85 Fed. Reg.  15198 (Mar. 17, 2020)................................................................. 8

85 Fed. Reg. 79190 ..................................................................................... 12

85 Fed. Reg. at 15202 .................................................................................. 8

**<u>RESPONSE TO PLAINTIFF'S MOTION TO REMAND</u>**

Defendants Broomall Operating Company LP d/b/a Broomall Rehabilitation and Nursing Center, Broomall Operating GP LLC, Vincent Rupert, Elizabeth Marasco-Kennedy, SavaSeniorCare, LLC, and Terpax, Inc. (the "Defendants")[1] file this Response to Plaintiff's Motion to Remand [ECF No. 23].

**<u>INTRODUCTION</u>**

The original Complaint was properly removable on multiple grounds, most indisputably diversity jurisdiction and federal question based on what the Third Circuit now regards as a completely preempted—that is, a jurisdictionally preempted—"willful misconduct" claim under the federal Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U.S.C. §§ 247d-6d, *et seq*., as recognized by the Third Circuit shortly after Plaintiff filed her Complaint.  *See Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393 (3d. Cir. Oct. 21, 2021).  Indeed, Plaintiff represented that she would *not* seek remand or, in a telephonic status conference with the Court, amend the Complaint.

Notwithstanding Plaintiff's representations, shortly after the initial status conference in this matter Plaintiff changed strategy and *attempted* to obviate the clearest grounds for jurisdiction by adding diversity-defeating defendants, and secondarily, by excising each and every allegation of willful misconduct that was pointed out in the original Notice of Removal.[2]

---

[1] Defendants SavaSeniorCare, LLC and Terpax, Inc. appeared specially in this action for the purpose of contesting this Court's jurisdiction over them.  While those Defendants oppose Plaintiff's Motion to Remand and join in this opposition principally lodged on behalf of Broomall Operating Company LP, Broomall Operating GP LLC, Vincent Rupert, and Elizabeth Marasco-Kennedy, they continue to appear only specially in this case and reiterate their objection to personal jurisdiction in this forum.

[2] A "Supplemental Notice of Removal" was filed after Plaintiff filed an Amended Complaint purporting to join new Defendants, pursuant to the newly-joined defendants' removal rights as "later-served defendants" under 28 U.S.C. § 1446(b)(2)(B).

Plaintiff's amendment, however, is procedurally ineffective. First, a plaintiff cannot defeat diversity simply by joining non-diverse defendants to a civil action following removal. Leave is required for such post-removal amendments to add non-diverse defendants, and requests for leave are reviewed with increased scrutiny under 28 U.S.C. § 1447(e). As explained in briefing on Defendant Broomall Operating Company LP's Motion to Strike, Doc. No. 14, leave was not requested. Even if leave had been requested, it should not have been granted. Plaintiff must convince the Court that the proposed amendment is offered in good faith, and not simply to circumvent federal jurisdiction. That cannot be established here because Plaintiff's counsel *admitted*, *see* Doc. No. 14-2, that the purpose was simply a change in strategy following the status conference "[i]n light of Judge McHugh's opinion" in other cases, "and in light of the Maglioli decision" remanding other cases filed against nursing homes for COVID-19 exposures. This is precisely the type of amendment that the Third Circuit instructs district courts to disregard when determining jurisdiction. In summary, a change in strategy is not a basis for amendment.

Moreover, Plaintiff's attempt to erase her "willful misconduct" claim is even more clearly flawed. It is blackletter law that a post-removal amendment intended to eliminate a federal claim does not alter or defeat jurisdiction. *Rockwell Int'l Corp. v. United States,* 549 U.S. 457, 474 n.6 (2007). So, despite Plaintiff's attempt to remove the words "willful," "willfully," "knowingly," "intentional," and similar words of jurisdictional significance from the pleadings, federal question jurisdiction nonetheless is discerned based on the *original* Complaint. Though Plaintiff attempts to re-plead around the elements of a "willful misconduct" claim under the PREP Act, the Amended Complaint should be read for its true intent—a claim that the Defendants acted "willfully," "intentionally," "knowingly" and/or "in disregard of a known or obvious risk" as stated in the original Complaint.

2

Defendants assert that the Third Circuit incorrectly concluded that complete preemption—that is, jurisdictional preemption—under the PREP Act is limited to willful misconduct claims, and further disagree with the Court's conclusion that federal officer removal jurisdiction does not attach to covered persons administering covered countermeasures in nursing homes as required by the Centers for Medicare and Medicaid Services and the Centers for Disease Control.

The PREP Act offers a comprehensive administrative process for victim claims management, comparable to other federal statutes that completely preempt state tort law, and immunizes "covered persons" such as the Defendants from all claims "related to" the administration or use of "covered countermeasures" such as the myriad infection control protocols implemented here at the behest of the Centers for Disease Control ("CDC") and Centers for Medicare and Medicaid Services ("CMS"), pursuant to a valid public health emergency declaration.

Finally, Defendants also disagree with the *Maglioli* Court's conclusion that nursing homes—with provider agreements with CMS, taking directions from the Department of Health and Human Services ("DHHS") to administer and use covered countermeasures recommended by the CDC and the Food and Drug Administration ("FDA") pursuant to published federal rules, outlined below—fails to meet the standard for federal officer removal jurisdiction under 28 U.S.C. § 1442(a)(1).  Plaintiff's challenge to the infection control program is in effect a collateral attack on conduct undertaken because federal regulators required individuals operating facilities to administer covered countermeasures.  Defendants Rupert and Marasco-Kennedy (the "Individual Defendants") have demonstrated that their pandemic-related activities were taken under the strict guidance and direction of federal officers; namely, the CMS, the Department of Health and Human

Services ("DHHS"), the CDC, and the Food and Drug Administration ("FDA").[3]  Therefore, even

if this Court disagrees that diversity jurisdiction or federal question jurisdiction are present, this

Court may continue to exercise supplemental jurisdiction over this case based on the Individual

Defendants' federal officer removal.  28 U.S.C. § 1367.

## ARGUMENT

**I.      Diversity jurisdiction exists because the non-diverse Defendants were added
         without required leave and were fraudulently joined to the action.**

In the interest of judicial economy and respect for this Court's Policy and Procedure II.B.5.,

these Defendants incorporate the entirety of *Broomall Operating Company LP's Motion to Strike*

*Amended Complaint* herein.  [ECF No. 14.]  The arguments set forth in the *Motion to Strike* address

the propriety of diversity jurisdiction for this matter despite Plaintiff's fraudulent joinder of the

Individual Defendants.  *Id.*

**II.     Federal question jurisdiction exists as Plaintiff's Amended Complaint states
         a "willful misconduct" claim that is completely preempted by the PREP Act.**

In Complaint Paragraphs 19, 144, 149, 156, and 157, Plaintiff pled that the Defendants

acted "negligent[ly]," "reckless[ly]," "intentional[ly]," "maliciously," and to the point, "*willfully,*

*and wantonly.*"  [ECF No. 1].  Shortly after Plaintiff filed the Complaint, however, the Third

Circuit issued an opinion concluding that "[t]he PREP Act's language easily satisfies the standard

for complete preemption of particular causes of action. . . .  Congress said the cause of action for

willful misconduct is exclusive, so it is."  *Maglioli*, 16 F.4th at 409–10.

---

[3] Defendant Marasco-Kennedy was not even employed at Broomall Rehabilitation and Nursing Center (the "Facility")
during the year 2020, but Plaintiff alleges, nonetheless, that she is somehow legally responsible for the Facility's
implementation of what became specific federal standards in response to the pandemic.  Claims against Ms. Marasco-
Kennedy should be dismissed or, if this Court finds some plausible basis for a continuing agency following her
separation, she is also entitled to invoke the same federal officer immunities she could have asserted as an agent at all
relevant times.

4

Defendants thus highlighted the Plaintiff's allegations relevant to this standard in detail in the Notice of Removal, Doc. No. 1, at Paragraphs 54–65.  As explained, the term "willful misconduct" means "an act or omission that is taken—(i) intentionally to achieve a wrongful purpose; (ii) **knowingly** without legal or factual justification; and (iii) in **disregard of a known or obvious risk** that is so great as to make it highly probable that the harm will outweigh the benefit."  42 U.S.C. § 247d-6d(c)(1)(A).  "The criterion stated in subparagraph (A) shall be construed as establishing a standard for liability that is more stringent than a standard of negligence in any form or recklessness."  *Id.* § 247d-6d(c)(1)(B).

Plaintiff then amended the Complaint, as counsel explained, "to clarify, to the extent we have not already done so, that we do not intend to make a claim under the civil liability sections of the PREP Act[.]"  *See* Doc. No. 14-2, at 1; *see also* Doc. No. 13 n.1.

Such post-removal amendments, however, are legally ineffective.  "It is true that, when a defendant removes a case to federal court based on the presence of a federal claim, an amendment eliminating the original basis for federal jurisdiction generally does not defeat jurisdiction." *Rockwell Int'l Corp.*, 549 U.S. 457, 474 n.6 (2007) (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 346, 357 (1988); *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 293 (1938)).  In that regard, Plaintiff's purpose for amending the Complaint is based on a misunderstanding of its legal effect.

This Court therefore should consider the *original* Complaint—not the *Amended* Complaint—to discern whether Plaintiff stated a willful misconduct claim.  Clearly it does.  The allegations Plaintiff eliminated plainly and repeatedly state that the Facility and its "managerial and supervisory staff negligently, recklessly, carelessly, **willfully**, and wantonly breached their duties," alleging that Defendants resisted assistance from the Pennsylvania National Guard, Coml.

5

¶ 56, that Defendants "intentional[ly]" understaffed the Facility, *id.* ¶¶ 107–109, that "nursing staff <u>cut corners</u>," *id.* ¶ 112, and that such "intentional" understaffing specifically caused the damages she is seeking in this case, *id.* ¶¶ 124(aa), 144(l).  While the label "willfully" was carefully excised from the Amended Complaint, the same factual allegations concerning "cutting corners," "understaffing," dismissing the national guard, and the like all remain.  *See* Doc. No. 13 at ¶¶ 19, 41, 44, 62, 83–121.  Further, every Count in the Amended Complaint demands an award for punitive damages which, under Pennsylvania law and consistent with the prior allegations, is awardable only for "torts that are committed **<u>willfully</u>**, maliciously, or so carelessly as to indicate wanton disregard of the rights of the party injured."  *Bert Co. v. Turk*, 257 A.3d 93, 119 (Pa. Super. 2021) (internal quotation omitted); [ECF No. 13 at Counts I-VI].

So while the Third Circuit in *Maglioli* concluded that the plaintiffs' allegations of punitive misconduct did not constitute "willful misconduct" in that particular case, the Court also explained, "We do not hold that all state-law causes of action are invulnerable to complete preemption under the PREP Act.  Conceivably, some state-law claims could fall within Congress's narrow cause of action for willful misconduct."  *Maglioli*, 16 F.4th at 412.  This is such a case.  Plaintiff specifically alleged "willful" misconduct and now tries to circumvent remand by amendment deleting words that make jurisdiction indisputable.  The amendment, however, cannot defeat federal question jurisdiction.

In summary, Plaintiff's Complaint allegations track the exact "willful" language of the statutory cause of action and allege specific actions—not conclusory characterizations—that Plaintiff alleges caused the injuries for which she is seeking damages.  While Plaintiff removed the word "willful" from the Amended Complaint, Plaintiff cannot simply eliminate these allegations by amendment to defeat federal jurisdiction.

### III.     Federal question jurisdiction exists because the PREP Act completely preempts all claims within the scope of PREP Act immunity.

While the Third Circuit in *Maglioli* concluded that only "willful misconduct" claims are completely preempted, *id.* at 411-13, courts in other jurisdictions have concluded that jurisdictional complete preemption applies broadly to *any* claim that is subject to PREP Act immunity, not just willful misconduct claims.  *See Garcia v. Welltower OpCo Grp. LLC*, 522 F. Supp. 3d 734, 743 (C.D. Cal. 2021) ("[T]he PREP Act is a complete preemption statute."); *see also Rachal v. Natchitoches Nursing & Rehabilitation Ctr. LLC*, Case 1:21-cv-334, n.3 (W.D. La. April 30, 2021) ("[T]he Court finds that the PREP Act is a complete preemption statute, thus creating a federal cause of action as specified therein.").

Defendants assert that Plaintiff alleged a completely preempted willful misconduct claim. Nevertheless, to the extent this Court is not inclined to agree, Defendants argue that the *Garcia* and *Rachal* courts correctly analyzed the statute and interpretive administrative guidance for the reasons explained below, and disagree with the *Maglioli* court that claims covered by PREP Act immunity other than willful misconduct are not completely preempted.

### i.     Plaintiff's claims fall within the scope of PREP Act immunity as they all "relate to" the administration or use of covered countermeasures by a "covered person."

In her Memorandum of Law in Support of Plaintiff's Motion to Remand, Plaintiff argues that PREP Act immunity does not apply to the allegations in the Amended Complaint because the claims do not "relate to" the administration or use of covered countermeasures.  Instead, Plaintiff contends that the claims focus on nursing home neglect allegations outside of the scope of PREP Act immunity.  Defendants disagree.

PREP Act immunity is broad.  Under 42 U.S.C. § 247d-6d(a), immunity is available to any "covered person" for all "claims for loss arising out of, relating to, or resulting from" the

"administration" or "use" of a "covered countermeasure," as those terms are defined by that section, provided the Secretary of the Department of Health and Human Services (HHS) issues a declaration to that effect.  A Declaration under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 was made on March 17, 2020.  85 Fed. Reg. 15198 (Mar. 17, 2020).  That Declaration remains in full force and effect today, as of the date of the Notice of Removal and Amended Notice of Removal, and it was in effect at all times material to the allegations set forth in Plaintiff's Amended Complaint.

First, the Facility employed "qualified persons," allegedly including Defendants Vincent Rupert and Elizabeth Marasco-Kennedy.[4]  The PREP Act defines "qualified persons" as "[A] licensed health professional or other individual who is authorized to prescribe, administer, or dispense such countermeasures under the law of the State in which the countermeasure was prescribed, administered, or dispensed."   Based on the plain language of the PREP Act, Pennsylvania law, and the allegations set forth in Plaintiff's Amended Complaint, the Facility is a "qualified person" under the PREP Act.

The Facility is also a "program planner," which is defined as an entity that "supervised or administered a program with respect to the administration, dispensing, distribution, provision, or use of a security countermeasure or a qualified pandemic or epidemic product, including a person who has established requirements, provided policy guidance . . ."  A "private sector employer or community group or other 'person' can be a program planner when it carries out the described activities [set forth in 42 U.S.C. § 247d-6d(h)(i)(6)]." 85 Fed. Reg. at 15202.

---

[4] Defendant Marasco-Kennedy was not employed by Broomall Operating Company LP at the time of the allegations pertinent to Plaintiff's Complaint.  However, as alleged in the Amended Complaint, Defendant Marasco-Kennedy is a "qualified person."

ii.     **Recent administrative guidance reinforces the intended breadth of the immunity, and that the PREP Act is a statute of complete preemption.**

On March 17, 2020, the Secretary of the Department of Health and Human Services created an administrative "countermeasures injury compensation program"[5] and, through various declarations, renewals, and guidance, invoked PREP Act immunity from civil claims by furnishing an administrative remedy for "any claim purportedly based on that pre-empted state law claim [which] is considered, from its inception, a federal claim and therefore arises under federal law." *Garcia*, at *5 (quoting *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 472 (1998)).

*Garcia* refers to recent guidance from HHS General Counsel noting that HHS interprets the PREP Act as "a 'Complete Preemption' Statute" under which "[o]nce complete preemption attaches, the district court is usually obligated to dismiss the case as pleaded, either because no federal cause of action is alleged or the exclusive initial venue is a federal administrative agency."[6]

The OGC Advisory Opinion concluded that the PREP Act completely preempts state law claims within the scope of its immunity provision, reasoning that "[t]he *sine qua non* of a statute that completely preempts is that it establishes either a federal cause of action, administrative or judicial, as the only viable claim or vests exclusive jurisdiction in a federal court.  **The PREP Act does both**."  *Id.* at 2 (emphasis added).

The *Garcia* and *Rachal* opinions and the OGC Advisory Opinion are well-reasoned and based on principles also applicable in the Third Circuit.  "[T]he complete preemption doctrine applies only if 'the statute relied upon by the defendant as preemptive contains civil enforcement provisions within the scope of which the plaintiff's state claim fails.'"  *Goepel v. Nat'l Postal Mail*

---

[5] *Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19*, 85 Fed. Reg. 15198-01, March 17, 2020.
[6] *See* Advisory Opinion 21-01 on the PREP Act Scope of Preemption Provision, Jan. 8, 2021, https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/2101081078-jo-advisory-opinion-prep-act-complete-preemption-01-08-2021-final-hhs-web.pdf ("OGC Advisory Opinion").

*Handlers Union*, 36 F.3d 306, 311 (3d Cir. 1994) (internal quotation omitted).  Second, there must

be "a clear indication of a Congressional intention to permit removal despite the plaintiff's

exclusive reliance on state law."  *Id.*  As the OGC Advisory Opinion explains, the PREP Act does

both.  The Countermeasures Injury Compensation Program provides a benefit for medical

countermeasures specifically relating to COVID-19.[7]  The administrative benefit from the Health

Resources & Services Administration ("HRSA") is an exclusive remedy with "the sole exception"

of an action in the U.S. District Court for the District of Columbia for "physical injury proximately

caused by willful misconduct," pursuant to 42 U.S.C. § 247d-6d(d)-(e).

     Consistent with Third Circuit law, the PREP Act provides an alternate civil enforcement

mechanism through a benefit claim with the HRSA under the Countermeasure Injury

Compensation Program ("CICP"), and Congress clearly indicated an intention to provide an

exclusively federal venue—in another district—for any claims relating to willful misconduct.[8]

The immunity from suit and an administrative/federal venue selections for its "sole exception" are

the hallmarks of what the OGC Advisory Opinion accurately described as the *sine qua non* for

complete preemption.

---

[7] *See* Health Resources & Services Administration, https://www.hrsa.gov/cicp (listing "medical countermeasures against the following: COVID-19").

[8] The *Maglioli* Court incorrectly holds that Congress' creation of an administrative remedy under the PREP Act evidences an intent to bar state-tort claims arising out of the negligent administration of covered countermeasures from being removed to federal court. *Maglioli* at p. 31.  Indeed, other statutory schemes with an administrative remedy plus civil tort cause of action have been held to have complete preemptive force.  The administrative nature of the federal remedy in the PREP Act is similar to other complete preemption statutes like the Air Transportation Safety and System Stability Act, as well as the Civil Service Reform Act ("CSRA"). In *Schwartz v. International Federation of Professional & Technical Engineers*, No. 3:07-CV-0978-D, 2007 U.S. Dist. LEXIS 80735 (N.D. Texas Oct. 31, 2007), the district court held the CSRA completely preempted certain of the plaintiffs' claims because, inter alia, the administrative remedy provided under the CSRA through the direction of the FLRA excluded other implied remedies. *Id*. at *12-13.  Further, in *In re WTC Disaster Site*, 414 F.3d 352 (2d Cir. 2005), the Second Circuit held that the Air Transportation Safety and System Stability Act ("ATSSSA"), a statute similar to the PREP Act, was a complete preemption statute. *See id*. at 375, 380. The ATSSSA preempted all state law claims and created a federal fund to provide exclusive remedies for individuals meeting the Act's criteria. *See* 49 U.S.C. § 40101. After the district court erroneously remanded 26 cases, the Second Circuit confirmed federal removal jurisdiction over all claims for injuries "related to" the 9/11 attacks based on the broad preemptive language of ATSSSA and the exclusive federal remedy for claims, even if pled in state law. *See In re WTC*, 414 F.3d at 375.

**iii.**    **Plaintiff's allegations fall within the scope of claims that are completely preempted by the PREP Act.**

Plaintiff's claim against all Defendants is summarized succinctly two paragraphs: in Paragraph 131(a), "By failing to establish and maintain an infection control program . . . which prevented the development and transmission of communicable diseases and infections, namely the transmission of COVID-19," and in Paragraph 216, asserting that plaintiff's decedent "died due to complications caused by the COVID-19 virus."

Plaintiff argues in this Motion that the case is somehow unrelated to the use of covered countermeasures but, contrary to this argument, explains at length in the introductory allegations to her Amended Complaint to address <u>specific</u> instances of countermeasure-related misfeasance that she must base her claims upon.  For example, at Paragraph 30 Plaintiff questions the re-use of PPE by staff members; at Paragraph 38 Plaintiff notes that Ms. DeMarco's temperature was read and was provided Tylenol (both of which are covered countermeasures); at Paragraph 41 Plaintiff notes the ordering of a COVID-19 test and criticizes the program plan in relationship to Ms. DeMarco's potential infection; and at Paragraphs 70 through 72, Plaintiff lodges criticisms of the Facility's pre-existing infection control program, which necessarily became the protected "program plan" once any portion of the program was utilized in combating COVID-19.

So, whether characterized as criticisms of the Defendants' policies, procedures, resources, hiring, staffing, training, or otherwise, those criticisms all lead to the essential claim that Defendants failed to maintain COVID-19 infection prevention and control practices and/or failed to appropriately "use" efficacious covered countermeasures and, as a result, Plaintiff's decedent died due to COVID-19.  The Amended Complaint centers on a criticism of the infection control program, which included a litany of covered-countermeasures deployed for the benefit of the

11

Facility's residents as it attempted to comply with evolving guidance from the CDC and CMS to prevent the spread of COVID-19.

Therefore, notwithstanding Plaintiff's characterizations, this case arises out of—and, *a fortiori*, it "relates to"—the "use" of "covered countermeasures" to address COVID-19 which is now within PREP Act immunity. There is no other plausible interpretation of Plaintiff's allegations than as a criticism of the "program planner's" infection control program. That includes allegations of alleged budgeting, marketing, human resource management, training, staffing, and policy and procedure manual deficiencies. *See* Am. Compl. While, indeed, those allegations are not explained, and their relevance is unclear,[9] Plaintiff quite plainly intends to state a claim premised on their causal significance to the misconduct alleged.

Plaintiff further contends that the harm in this case arises out of the "non-use" of covered-countermeasures, and attempts to argue that complete preemption does not cover an allegation of non-use. *See id.* at ¶ 131. As explained above, the DHHS has already determined that non-use may nevertheless be a "use" of a covered countermeasure.[10] *See* 85 Fed. Reg. 79190. Looking to *Maglioli,* the Third Circuit clearly stated that, while DHHS's advisory opinions and opinion letters on *jurisdiction* are not afforded deference, HHS is nevertheless afforded deference as to the *scope* of the PREP Act. "The Secretary controls the scope of immunity through the declaration and amendments, within the confines of the PREP Act." *Maglioli*, 16 F.4th at 401.

---

[9] The Amended Complaint repeatedly alleges, for example, that the Facility was short-staffed but does not explain how that same alleged lack of staffing—which would *decrease* a patient's exposure to staff—can *increase* the patient's infection risk.

[10] Though the Third Circuit's opinion in *Maglioli* is critical of the deference afforded to DHHS, the Third Circuit only declined to extend deference to the agency's assertion that the PREP Act completely preempts claims other than those for "willful misconduct" under the statute. The Court did not decide that the agency receives no deference in its rulemaking regarding the scope of the "uses" under the PREP Act, and whether immunizing "use" of covered countermeasures also implies immunity for "non-use" under most circumstances. Rather, "[t]he Secretary controls the scope of immunity through the declaration and amendments, within the confines of the PREP Act." *Maglioli* at 16 F.4th at 401.

As the HHS Secretary set forth in the Fourth Amendment to the Declaration Under the PREP Act on December 9, 2020, "Prioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declaration's liability protections."  *See id.* § IX ("Administration of Covered Countermeasures").  More broadly, "not administering a Covered Countermeasure to one individual in order to administer it to another individual can constitute 'relating to . . . the administration to . . . an individual' under 42 U.S.C. 247d-6d."  *Id.*  For example, "the failure to administer the COVID-19 vaccine to the person in a less-vulnerable population 'relat[es] to . . . the administration to' the person in a vulnerable population."  *Id.*

The OGC Advisory Opinion also rejects Plaintiff's argument that claims of non-use are outside the scope of Prep Act preemption, explaining, "At one extreme, plaintiff may have pleaded that the facility failed *in toto* to provide any of its staff or patients with any PPE, a covered countermeasure if NIOSH approved or FDA cleared or waived.  Other plaintiffs allege that the quantity of PPE was inadequate, that staff were not timely provided PPE or that staff were not adequately trained to use PPE.  The latter three complaints reflect many of the complaints that we have reviewed."  OGC Advisory Opinion, *supra*, at 2.  However, "[D]ecision-making that leads to the non-use of covered countermeasures by certain individuals is the gist of program planning, and is expressly covered by PREP Act."  *Id.* at 4.  The OGC Advisory Opinion thus rejects the frequent distinction of negligence claims stemming from "non-use" of countermeasures as a "'black and white' view [that] clashes with the plain language of the PREP Act, which extends immunity to anything 'relating to' the administration of a covered countermeasure."  *Id.* at 3.

Plaintiff's claims closely reflect the claims reviewed and considered by the DHHS OGC and addressed through DHHS regulations further explaining the types of "administration" or "use"

of covered countermeasures that its emergency declaration includes.  DHHS specifically intended

for the immunity to apply broadly in all situations relating to the administration or use of covered

countermeasures, except the most exceptional failure *in toto* to administer a required plan.

As Plaintiff's allegations all clearly relate to the Facility's infection control program, the

allegations set forth in the Amended Complaint fall within the scope of the PREP Act, and

therefore, Plaintiff's state-law claims for loss are completely preempted.

### IV.   Federal officer jurisdiction exists as Defendants Rupert and Marasco-Kennedy were subject to the requisite federal officer control to satisfy the jurisdictional test.

The Individual Defendants filed a Supplemental Notice of Removal on January 14, 2022,

asserting federal jurisdiction under 28 U.S.C. § 1442(a)(1), which provides for removal when a

defendant is sued for acts undertaken at the direction of a federal officer. "Unlike the general

removal statute, the federal officer removal statute [Section 1442(a)] is to be 'broadly construed'

in favor of a federal forum." *In re Commonwealth's Motion to Appoint Counsel Against or Directed

to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) (quoting *Sun Buick, Inc. v. Saab Cars

USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994).  The case is removable pursuant to Section 1442(a)

because "(1) the Individual Defendants are 'persons' within the meaning of the statute; (2) the

Plaintiffs' claims are based upon the Individual Defendants' conduct 'acting under'[11] the United

States, its agencies, or its officers; (3) the Plaintiffs' claims are 'for, or relating to' an act under

color of federal office; and (4) the Individual Defendants raise a colorable federal defense to the

---

[11] The specific "acts" discussed herein and attributable to Defendant Elizabeth Marasco-Kennedy are those specific acts Defendant Marasco-Kennedy took while an employee at Broomall Rehabilitation and Nursing Center until November 2019.  Plaintiff criticizes and attempts to form a causal link between those certain pre-pandemic actions and Ms. DeMarco's death.  Any other "act" of the Individual Defendants discussed and taken after November 2019 are those actions undertaken by Defendant Rupert and the Facility's Director(s) of Nursing at the pertinent times alleged in Plaintiff's Amended Complaint; namely, January through April of 2020.

Plaintiff's claims." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016).   All requirements for removal under § 1442(a)(1) are satisfied here.

### i.      The Individual Defendants are "persons."

The Individual Defendants are both "persons" under the federal officer removal statute. The term "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; *see also Goncalves*, *supra*, 865 F.3d at 1244.

### ii.     The federal government exercised direct and detailed control over Defendants' actions.

The "acting under" requirement, like the federal removal statute overall, is to be "liberally construe[d]" to cover actions that involve "an effort to assist, or to help carry out, the federal supervisor's duties or tasks." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007)); *see also Defender Ass'n*, 790 F.3d 457, 468 (2015).  To satisfy the second requirement ("acting under" a federal officer) "a private person's actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Watson*, 551 U.S. at 152.  Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.  A specific instruction from a federal officer, or a detailed regulation to compel specific conduct satisfies the second requirement. *See Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d. 387 (5th Cir. 1998).

Instructive on this point is the case of *Cessna v. Rea Energy Coop., Inc.,* 753 Fed. Appx. 124 (3d Cir. 2018).  In *Cessna*, the "acting under" requirement was at issue.  The case involved return of "Patronage Capital" allegedly owed to members as set forth in Rea's bylaws as a cooperative.  Rea removed the case under federal officer removal jurisdiction.  The court found it significant to the

"acting under" requirement that "REA's existence and continued operation implement a long-running federal program [Rural electrification]." *Id*. at 127.  The court further found it significant that "REA was created with funding under the Rural Electrification Act.  In addition to being heavily regulated by federal law, its activity is circumscribed by the terms of its loan agreement with RUS." *Id*.  The same can be said of the Individual Defendants in this matter who are licensed health care providers managing the operation of Broomall Operating Company LP during a pandemic and on the frontlines of healthcare to work as an agent of the federal government's implementation of pandemic response efforts.

Like the REA Defendants, who were required to comply with detailed federal regulations, so are the Individual Defendants here.  In 1987, President Ronald Reagan signed into law the first major revision of the federal standards for nursing home care since the 1965 creation of both Medicare and Medicaid.  42 U.S.C § 1396r, 42 U.S.C. § 1395i-3, 42 C.F.R § 483.  The landmark legislation created new expectations for nursing homes and their care.  Long-term care facilities seeking Medicare or Medicaid funding are required to provide services so that each resident can attain and maintain her highest practicable physical, mental, and psychosocial well-being.  Since the enactment of OBRA, CMS has exercised a high degree of federal regulation of Nursing homes.  As the nation's largest health insurer, it also tied their compliance to funding and reimbursement.

Significantly, on or about October 10, 2016, CMS issued a final rule to revise requirements for long-term care facilities to participate in the Medicare and Medicaid program.  In addition to specific statutory requirements set out in sections 1819 and 1919 and elsewhere in the Act, sections 1819(d)(4)(B) and 1919(d)(4)(B) of the Act permit the Secretary of the Department of Health and Human Services (the Secretary) to establish any additional requirements relating to the health, safety, and well-being of skilled nursing facility and nursing facility residents, respectively, as the Secretary

16

finds necessary.  Under sections 1866 and 1902 of the Act, providers of services seeking to participate in the Medicare or Medicaid program, or both, must enter into a provider agreement with the Secretary or the state Medicaid agency, as appropriate.  Long-term care ("LTC") facilities seeking to be Medicare and Medicaid providers of services must be certified as meeting federal participation requirements.  81 Fed. Reg. 68688.

CMS requirements for LTC facilities are directly analogous to REA which was funded by loans provided by the federal government and was subject to regulations designed to provide utility services to rural areas.  The federal government stated an objective to provide for the care of nursing home residents and created a mandatory federal regulatory framework to convert the private entities previously performing this service as federal officers or agents.  CMS reimbursement under provider agreements are akin to the loans provided to REA.

One pertinent example of this is regulatory framework is the "Medicare and Medicaid Programs; Emergency Preparedness Requirements for Medicare and Medicaid Participating Providers and Suppliers" Final Rule (81 Fed. Reg. 63860 (Sept. 16, 2016)) ("Final Rule") which establishes national emergency preparedness requirements for participating providers and certified suppliers to plan adequately for both natural and man-made disasters, and coordinate with Federal, state, tribal, regional and local emergency preparedness systems.  The Final Rule also assists providers and suppliers to adequately prepare to meet the needs of patients, clients, residents, and participants during disasters and emergency situations, striving to provide consistent requirements across provider and supplier-types, with some variations.  *Id.*  Consistent with the emergency requirements, CMS would issue interpretive guidance and directives.  *Id.*  **However, there can be no question that under the Final Rule CMS "directives" and "guidance" are in reality mandatory requirements**.

The COVID-19 pandemic resulted in a number of new regulations, directives, guidance and requirements issued as a result of the federal government acting through the regulatory framework of CMS and the CDC to convert nursing homes into frontline responders to the declared national public health emergency.  As early as February 6, 2020, CMS took direct action to prepare healthcare facilities for a national response to what would be become the COVID-19 pandemic.[12]  Additionally, as of February 1, 2020, the CDC provided superseding guidance to state and local health departments and healthcare facilities including detailed recommendations for patient screening.  The CDC acknowledged that current knowledge of the virus was evolving and that these efforts were part of an "ongoing US public health response to identify and contain this outbreak and prevent sustained spread of 2019-nCov in the United States."[13]  On or about March 4, 2020, CMS announced several additional actions aimed at limiting the spread of the COVID-19 virus, including requiring healthcare facilities to maintain specific infection control and prevention policies as a condition for participation in CMS programs.[14]  Additionally, CMS called for healthcare facilities to work at the direction and coordination of the CDC and local public health departments.  Finally, CMS addressed the screening of entrants into nursing facilities.

The Defendants were obligated to and did follow these directives in an effort to assist, or to help carry out, the duties or tasks of CMS and the CDC in responding to the COVID-19 pandemic. CMS was controlling and reimbursing the Facility for actions taken by its employees, particularly Vincent Rupert and its Director(s) of Nursing, in response to the COVID-19 pandemic.

---

[12] Centers for Medicare & Medicaid Services, Press Release "CMS Prepares Nation's Healthcare Facilities for Coronavirus Threat" (February 6, 2020) (available at https://www.cms.gov/newsroom/press-releases/cms-prepares-nations-healthcare-facilities-coronavirus-threat).

[13] Centers for Disease Control and Prevention, Update and Interim Guidance on Outbreak of 2019 Novel Coronavirus (February 1, 2020) (available at https://emergency.cdc.gov/han/HAN00427.asp).

[14] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention Concerning Coronavirus (COVID-19): FAQ's and Considerations for Patient Triage, Placement and Hospital Discharge (March 4, 2020) (available at https://www.cms.gov/files/document/qso-20-13-hospitalspdf.pdf-2).

On March 10, 2020, CMS published a memorandum clarifying and amending policies in light of the CDC's expansion of the types of masks healthcare workers may use in situations involving COVID-19.[15]  In doing so, CMS acknowledged the federal government was taking "critical steps" to prepare health care facilities to respond to COVID-19, and acknowledged the need to "explore flexibilities and innovative approaches within our regulations to allow health care entities to meet the critical health needs of the country."  The memorandum issued on this date cites specifically to the CDC regarding addressing the supply, allocation, and use of various items utilized to prevent the spread of infection and directly treat the virus including PPE and respirators, and further provided guidance on the use of airborne infection isolation rooms (AIIR).  On this same date, the Secretary of Health and Human Services (HHS) issued notice pursuant to section 564 of the Federal Food, Drug, and Cosmetic (FD&C) Act that there is a public health emergency that has a significant potential to affect national security or the health and security of United States, and in doing so, declared justifying the authorization of emergency use of personal respiratory protective devices during the COVID-19 outbreak, pursuant to section 564 of the FD&C Act, subject to the terms of any authorization issued under that section.[16]

Three days later, on March 13, 2020, CMS published revised directives, specifically aimed at nursing homes, to "improve infection control and prevention practice to prevent the transmission of COVID-19."[17]  In updating its directives, **CMS <u>ordered</u>** facilities to restrict visitors, cancel communal activities, screen staff, amend policies regarding interaction with vendors, and handle

---

[15] Centers for Medicare & Medicaid Services, Guidance for use of Certain Industrial Respirators by Health Care Personnel (March 10, 2020) (available at https://www.cms.gov/files/document/qso-20-17-all.pdf).

[16] Department of Health and Human Services, Office of the Secretary, Emergency Use Declaration, Federal Register/ Vol. 85, No. 47 (March 10, 2020) (available at https://www.govinfo.gov/content/pkg/FR-2020-03-10/pdf/2020-04823.pdf).

[17] Centers for Medicare & Medicaid Services, Guidance for Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in Nursing Homes (Revised) (March 13, 2020) (available at https://www.cms.gov/files/document/qso-20-14-nh-revised.pdf).

potential end-of-life interactions with family members, among other interventions.  It is critical to note that these orders superseded existing Resident's Rights (e.g., to have visitors) set forth at 42 C.F.R. § 483.10.  CMS in effect overruled federally-protected rights to visitation and barred visitors as a part of the national effort to prevent the transmission of COVID-19.

CMS's decision to suspend and supersede a Resident's Rights is one of the examples which demonstrates a clear basis for federal officer jurisdiction and federal preemption under the PREP Act. The Defendants were effectively converted into actors for the United States to respond to COVID-19 pursuant to a unitary national strategy required by the federal government.

CMS also provided interpretive guidance regarding patient transfers and accepting patients with COVID-19.  Critically, a CMS memorandum on this date acknowledged scarcity of PPE such as gowns, N95 respirators, surgical masks and ABHR, and noted it would not cite facilities for lack of supplies for reasons outside of their control.  Again, CMS directed infection control efforts and clarified CDC guidance to preserve scarce medical resources including PPE and maximizing the capacity of the healthcare system to mitigate the spread of the pandemic.

Also on March 13, 2020, President Donald J. Trump issued a "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," after which rapid action was taken to waive restrictions and expand capacity for healthcare entities, providers, and suppliers to coordinate a national response to the national emergency.  This can leave no question that there was a national response effort which converted the defendants into agents of the United States.

 "'Acting under' covers situations, like the present matter, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."  *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012).  The federal government

deployed the full panoply of authority to compel specific actions on its behalf for the administration of countermeasures by medical providers—many of whom were already under the auspices of CMS's regulatory oversight—to respond to the national public health emergency.

On April 2, 2020, CMS issued **new** guidelines aimed specifically to long-term care facilities to mitigate the spread of COVID-19, with the stated purpose of 'critical, needed leadership" and issuing "immediate" actions to "keep patients and residents safe."[18]  Specifically, CMS directed long-term care facilities to "immediately" ensure compliance with "all CMC and CDC guidance related to infection control."  Again, CMS referred facilities to revised CDC guidelines.  CMS also implemented actions to be undertaken immediately including: 1) universal screening; 2) conservation of PPE; 3) proper PPE use; and 4) allocation of separate staffing, among other directives.  These instructions were part of mandatory regulations imposed on long term care facilities by OBRA and regulations issued by CMS.

On April 19, 2020, CMS announced new regulatory requirements for nursing facilities to notify residents, families, and representatives of COVID-19 cases.[19]  Nursing homes were required to report COVID-19 cases and deaths directly to the CDC on an ongoing basis as a result of an unprecedented CMS requirement issued on May 1, 2020.  The Trump Administration implemented the new reporting requirement to develop a robust federal disease surveillance system to quickly identify problem areas and inform future infection control actions.  By law, CMS regulates and oversees nursing homes, which are certified to provide Medicare and/or Medicaid skilled nursing facility services.

---

[18] Centers for Medicare & Medicaid Services, COVID-19 Long-Term Care Facility Guidance (April 2, 2020) (available at https://www.cms.gov/files/document/4220-covid-19-long-term-care-facility-guidance.pdf).

[19] Centers for Medicare & Medicaid Services, Press Release "Trump Administration Announces New Nursing Homes COVID-19 Transparency Effort" (April 19, 2020) (available at https://www.cms.gov/newsroom/press-releases/trump-administration-announces-new-nursing-homes-covid-19-transparency-effort).

At all relevant times, the Defendants in the present action, in their preparation and response to the COVID-19 outbreak, were acting at the specific instruction and oversight of the federal government, specifically DHHS, CDC, CMS, and FDA in responding to a federal effort to address the on-going national state of emergency. The Individual Defendants' actions were taken "in an effort to assist, or to help carry out, the duties or tasks" dictated by the CDC and CMS in responding to the COVID-19 pandemic. The Defendants' actions and conduct were taken due to unprecedented and "strong government intervention" which went beyond the "mere auspices of federal direction." *See Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N. D. Cal. 1992). Defendants' were acting specifically at the direction and under the supervision of the United State government with respect to various countermeasures implemented to prevent and treat the COVID-19 virus including following evolving and specific guidelines from CMS and the CDC with respect to: 1) infection control policies and procedures; 2) PPE procurement; 3) PPE allocation; 4) admission and discharge of residents; 5) managing visitors and outside persons 6) staffing allocation and retention; 7) isolation protocols and management, among multiple additional directives. In short, Defendants' response to the COVID-19 outbreak as it relates to Ms. DeMarco was directly related to what they were required to do by the federal government.

### iii. The allegations in the Amended Complaint arose from actions taken by Defendants pursuant to federal direction.

The next requirement, often referred to as the "nexus" or "causation" requirement, demands that the alleged conduct have been undertaken "for or relating to" a federal office. To meet this requirement, "it is sufficient for there to be a connection or association between the act in question and the federal office." *Defender Ass'n*, 790 F.3d at 471. There is a clear causal nexus between the claims against the Individual Defendants and the actions taken by Defendants in responding to and administering care related to the COVID-19 outbreak. Plaintiffs' Amended Complaint specifically

alleges a deficiency in the Defendants' actions concerning use of PPE and infection control procedures taken in efforts to prevent the transmission and spread of COVID-19 while preserving resources to enable a nationwide response. Unquestionably, the nexus element is met as evidenced by various orders, guidelines and recommendations followed by the Defendants' in addressing same.

iv.   **Defendants have appropriately asserted a "colorable defense."**

The Defendants meet the final requirement insofar as they intend to assert a colorable federal defense including immunity under the PREP Act.[20] For purposes of removal, the defense must be "colorable" and need not be "clearly sustainable" as the purpose for the removal statute is to secure that the validity of the defense may be tried in federal court. *Willingham v. Morgan,* 395 U.S. 402, 407 (1969). "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court," and for this reason "we have rejected a 'narrow, grudging interpretation' of the statute" when analyzing whether a defendant has raised a colorable federal defense. *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999).

Based the Third Circuit's holding in *Maglioli* and federal preemption under the PREP Act, outlined above, it is clear that defendants have more than a colorable defense, and this element is satisfied. Based on the foregoing, this Court has removal jurisdiction under the federal officer removal statute, and Plaintiff's motion should be denied.

**CONCLUSION**

For the reasons stated above, this Court has diversity, federal question, and federal officer jurisdiction over this matter. The properly joined parties to this case are diverse in citizenship from Plaintiff, Plaintiff's claims are completely preempted by the PREP Act, and the Defendants

---

[20] The Individual Defendants are prepared to file *Motions to Dismiss* similar to those lodged by Broomall Operating Company LP once the jurisdictional motions are decided and this Court lifts its stay of this matter. *See* ECF No. 15; 28.

were acting as officers of the federal government at all times material to Plaintiff's Amended

Complaint.  As such, Plaintiff's Motion to Remand should be denied.


Respectfully submitted,
STEPTOE & JOHNSON PLLC

/s/    Deva A. Solomon
Deva A. Solomon (PA ID 210009)
**STEPTOE & JOHNSON PLLC**
600 17th Street, Suite 2300S
Denver, CO 80202
(303) 389-4362
(304) 933-8766 (fax)
deva.solomon@steptoe-johnson.com


Kristen Andrews Wilson (PA ID No. 310591)
1233 Main Street, Suite 3000
Wheeling, WV 26003
(304) 231-0444
(304) 933-8624 (fax)
kristen.andrews-wilson@steptoe-johnson.com

*Counsel for Defendants*

24

**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**Rose Marie M. Testa, as Executrix of the
Estate of Mary DeMarco, deceased,**

        **Plaintiff,**　　　　　　　　**CIVIL ACTION NO: 2:21-cv-05148-KSM**

**v.**

**Broomall Operating Company LP d/b/a
Broomall Rehabilitation and Nursing
Center; Broomall Operating GP LLC;
SavaSeniorCare, LLC; Terpax, Inc;
Vincent Rupert; Elizabeth Marasco-
Kennedy; and the Director of Nursing
during the events in question,**

        **Defendants.**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this 8th day of February 2022, I electronically filed the foregoing **_RESPONSE TO PLAINTIFF'S MOTION TO REMAND_**" with the Clerk of the Court using the CM/ECF system, which will send notice of the same to counsel and to registered attorneys as follows:

Robert F. Daley, Esq.
Sara J. Watkins, Esq.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
*Counsel for Plaintiff*

/ s/    Deva A. Solomon
Deva A. Solomon (PA ID 210009)